STREET-WORKS DEVELOPMENT LLC and
CRESTWOOD LOFT PARTNERS LLC,

                    Plaintiffs,

      -against-

JOHN H. RICHMAN,

                  Defendant.

**Case No. 13 CV 0774 (VB)**

**ANSWER, COUNTERCLAIMS &
THIRD PARTY CLAIMS**

Defendant per se, JOHN H. RICHMAN, hereby answers as follows:

# I
## Admissions and Denials

1. Defendant defers to this Honorable Court on the issue of the law concerning diversity of citizenship pursuant to 28 U.S.C. §1332. Defendant is without information sufficient to admit or deny as to the truth of the averment regarding Plaintiffs' jurisdictions for the purposes of 28 U.S.C. §1332. Defendant denies that Plaintiffs' damages in this controversy exceed Seventy Five Thousand ($75,000.00) Dollars, exclusive of interest.

2. Defendant defers to this Honorable Court on the issue of the law concerning the pendent and ancillary jurisdiction issues regarding the equitable relief requested by Plaintiffs.

3. Defendant defers to this Honorable Court on the issue of the law concerning whether the Venue is proper in this district pursuant to 28 U.S.C. § 1391 (a) (1) and (b) (2). However, Defendant states that a substantial part of the events giving rise to Plaintiffs' claims occurred in the State of Florida. Defendant is without information sufficient to admit or deny as to the truth of the averment regarding the districts the Plaintiffs Crestwood Loft Partners LLC reside in.

4-5. Defendant is without information sufficient to admit or deny as to the truth of the averments in Paragraph 4-5.

6. Defendant admits that he is a resident of the State of Florida with an address at 1320 Lenox Avenue, Miami Beach, Florida 33139; however, Defendant denies that at all times relevant hereto, he transacted business in the State of New York.

7. Defendant admits that in or about the Spring of 2011, he had interest in developing two (not one as stated inaccurately in the complaint) parcels of real property known as 300 and 308 Columbus Avenue, Tuckahoe, New York, located in the County of Westchester, State of New York (the "Project") and many other parcels in common with others but Defendant denies that the other party was Street-Works Development, LLC.

8. Defendant denies that the joint venture which was formed called Street-Works/Richman ("SWR") was with Street-Works Development, LLC.

9. Defendant admits that SWR also identified certain other potential sites for development, but Defendant is without information sufficient to admit or deny as to the truth of the averments that no agreements regarding such other sites were ever undertaken.

10. Defendant is without information sufficient to admit or deny as to the truth of the averments as to what Plaintiffs knew regarding investment capital from persons outside of SWR.

11. Defendant denies that Street-Works or the partners of SWR indicated to Defendant that the initial cash capital needed to pursue the Project would come from outside private investors. Defendant admits that the partners of SWR indicated to Defendant that institutional investors would be required to fund the acquisition of the Property and the construction and development of the Project.

12. Defendant denies the averments in Paragraph 12.

13. Defendant denies that he had any discussions with Plaintiffs regarding how the parties would share in certain developer fees and special considerations of SWR. Defendant admits that he had

discussions and reached an agreement with the partners of SWR on how each party of SWR would share the developer fees and special considerations including non-recourse advances to be paid to Defendant prior to the Private Investors receiving the cash equivalent to their respective investments or any return thereon.

14. Defendant denies the averments in Paragraph 14 with respect to Street-Works. Defendant admits that he had discussion with the partners of SWR regarding how Defendant was to receive non-recourse advances against future distribution starting at the inception of the joint venture.

15. Defendant denies that the parties to SWR never reached a firm agreement on sharing of fees, promotes and non-recourse advances to Defendant.

16-17. Defendant is without information sufficient to admit or deny as to the truth of the averments in Paragraph 16-17.

18. Defendant admits that plaintiff Street-Works, for SWR, entered into a purchase and sale agreement, for the Property dated July 1, 2011. Defendant is without information sufficient to admit or deny as to the truth of the averments regarding the assignment to plaintiff Loft.

19. Defendant denies that the partners of SWR and the Defendant had not formalized the organization basis of their respective interest in SWR and the Project and the other potential SWR projects by the Summer of 2011 and the other averments in Paragraph 19. Defendant admits that the partners of SWR did reach the final agreement on the sharing of fees, distributions, promotes and non-recourse advances to Defendant in the late Fall of 2011.

20. Defendant admits the averments in Paragraph 20 regarding his not drawing any compensation until December 2011 and admits that he advised Levien in writing that he needed "current income" and that his need for current income was "critical". Defendant is without

information sufficient to admit or deny as to the truth of the averments regarding Plaintiffs drawing compensation.

21. Defendant denies that he at any time offered to invest capital in the Project or promised to bring any private capital to invest in the Project. Defendant denies that he had failed to interest any institutional money in the Project.

22. Defendant is without information sufficient to admit or deny as to the truth of the averments regarding Plaintiffs' motive as set forth in Paragraph 22. Defendant denies that he entered into a service agreement with Plaintiffs.

23-24. Defendant denies the existence of a service agreement with Plaintiffs.

25. Defendant admits that he was sent draft documents in February 2012 with new proposed interest in Partners on terms that were inconsistent the terms for the Project agreed to by SWR partners in 2011.

26. Defendant admits he never accepted Plaintiffs' offer of reduced membership interest in Partners and never executed any organizational document which would reflect his agreement to be a member of Partners under those terms.

27. Defendant denies that he choose not to become a member of Partners under any terms and the partners of SWR would abide by the terms they had agreed to in 2011. Defendant admits that he offered, without prejudice and reserving all rights, to consider alternate means to formalize their relationship but all of those offers were unacceptable.

28. Defendant admits that he refused all terms that were inconsistent the terms the partners of SWR had agreed to in 2011.

29-30. Defendant denies the averments in Paragraph 29-30.

31. Defendant admits that on or about June 27, 2012, the Cigna Letter of Intent to SWR was agreed to and accepted by Plaintiff Street-Works but denies that it was not accepted by SWR as Plaintiff Street-Works made clear in its transmittal that it was accepting the Cigna Letter of Intent for SWR.

32 and 37. Defendant denies the averments in Paragraph 32 and 37.

33. Defendant admits that the Principal Term Sheet did not name a specific borrower name but had to be the owner of SWR's Project and their borrower be a "Single-purpose, bankruptcy-remote entity".

34-36, 39 and 39. Defendant denies the averments in Paragraph 34-36, 38 and 39

40. Defendant denies the averments in Paragraph 40.

41. Defendant admits that the Project was fully entitled but denies the remaining averments in Paragraph 41.

42. Defendant is without information sufficient to admit or deny as to the truth of the averments in Paragraph 43 regarding Plaintiffs' beliefs.

43. Defendant denies that on or about September 15, 2012 Defendant's involvement in the Project was at a reduced level; that Defendant had an unexpected move to Florida; that Defendant's made demands for advances or that plaintiff Street-Works terminated SWR and so advised Defendant,

44. Defendant denies that plaintiff terminated SWR or any purported Service Agreement.

45 and 46. Defendant denies the averments in Paragraph 45 and 46.

47. Defendant denies the averments in Paragraph 47.

48. Defendant is without information sufficient to admit or deny as to the truth of the averments in Paragraph 48.

49. Defendant admits he sent an October 5, 2012 letter to Messrs Narva, Heapes and Levien and included plaintiff Street-Works.

50, 52-54. Defendant denies the averments in Paragraph 50, 52-54

51. Defendant admits the averments in Paragraph 51.

55-59. Defendant is without information sufficient to admit or deny as to the truth of the averments in Paragraph 55-59

60. Defendant denies that he was offered a membership interest in Partners consistent with the terms agreed to by the partners of SWR in 2011. Defendant admits that Plaintiffs made offers starting in November 2012 that were characterized solely as settlement discussions.

61. Defendant admits that in the period between February 2012 and February 2013, the SWR partners made proposals to the Defendant regarding his interest in the Project and potential development sites which were reduction from the 2011 SWR agreement, which were rejected by Defendant.

62-64. Defendant admits that he again rejected the reduced membership interest in Partners and the potential development sites.

65-66. Defendant denies the averments in Paragraph 65-66 as Plaintiffs have sworn under oath that Defendant had no impact on their closing on the Project and that they were ready and able to close as required under the PSA.

67. Defendant is without information sufficient to admit or deny as to the truth of the averments in Paragraph 67.

68. Defendant denies the averments in Paragraph 68 as Plaintiffs have sworn under oath that they have not abandoned the Project.

69. Defendant denies the averments in Paragraph 69 as the Plaintiffs are pursuing other Defendants in New York State Court they now claim are responsible for any and all losses they claim for their investment in the Project. Defendant is without information sufficient to admit or deny as to the truth of the averments in Paragraph 69 regarding the amount of their investment.

70-90. Defendant defers to this Honorable Court on conclusions of law that are set forth in Paragraph 70-90 that the Court has not early decided. The Defendant denies the averments in Paragraphs 70-90 as to any factual matters set forth therein and in Paragraphs 1-69 to which Plaintiffs allege Defendant did not specifically respond.

## II
## Affirmative Defenses

FIRST DEFENSE:
Plaintiffs have not shown that this is the proper venue as most of Defendant's business activity was conducted in Florida, not New York, nor they have not plead the required proof that none of the members of Blumberg or Hornrock, or any constituent member of Plaintiffs or any such member, or any derivative member, is a citizen of the state of Florida.

SECOND DEFENSE:
Plaintiffs' have failed to state a cause of action, pursuant to Fed. R. Civ. Proc. 12(b)(6).

THIRD DEFENSE:
Plaintiffs' complaint fails for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. Proc. 12(b)(1).

FOURTH DEFENSE:
Plaintiffs' have failed to join one or more necessary parties to this dispute (including, without limitation, SWR's joint venture partners Ken Narva, Richard Heapes and Jeff Levien and other such entities as Street Works, LLC pursuant to Fed. R. Civ. Proc. 12(b)(7).

FIFTH DEFENSE:

Defendant had an economic self-interest in the Project and SWR and by informing Cigna and the other recipients with his October 5, 2012 letter, he was reminding them that he remained a principal in SWR and was protecting his economic self-interest.

SIXTH DEFENSE:
Plaintiffs' have "slept on their alleged rights" and failed to mitigate their damages (assuming arguendo that they had either) by failing to timely close on the property or replace Cigna. Plaintiffs contend that they still have the right to purchase the property in the specific performance action; therefore, the Plaintiffs have had sixteen months to replace Cigna, assuming that Defendant's letter was the actual cause of Cigna no longer being interested. (They actually now claim that they were ready and able to close on the Property without Cigna and irrespective of any issues they claim Defendant caused and have sued the seller for specific performance. Plaintiffs' position in their state action is that the seller is responsible for them not closing; therefore, Defendant is not responsible for any claimed damages.

SEVENTH DEFENSE:
Plaintiffs have violated the doctrine of res judicata as the damages they seek in this matter they are also the same damages sought in a New York State matter against the property seller. In that matter they assert they were ready and able to close without Cigna and irrespective of any issues they claim Defendant caused. This doctrine bars claims that have either been litigated *or* that could have been litigated from being litigated again.

EIGHTH DEFENSE:
Plaintiffs come to this matter with unclean hands having assigned the PSA without Defendant's approval from SWR to an entity that Defendant had no interest in and is controlled by Plaintiffs. In addition, Plaintiffs falsely claimed that Defendant was never a partner in the venture, sent no notice of termination as claimed and only created their position asserting a termination six months later upon the filing of this matter. Furthermore, Plaintiffs have made knowing false

statements for which there is no evidentiary support in pleadings as described in the ninth

defense.

NINTH DEFENSE:
Plaintiffs have made knowing misstatements with no evidentiary support in their pleadings

stating that "the closing dated for the PSA expired with plaintiff unable to purchase the Property"

and that "plaintiffs were forced to abandon the Project" while at the same time they are pursuing

a cause for specific performance to purchase the property for the Project arguing that the closing

date is not yet called for under the PSA.

TENTH DEFENSE:
Plaintiffs have breached their duty to SWR, by among other action, the assignment of the PSA.

ELEVENTH DEFENSE:

Plaintiffs have an adequate remedy at law other than this matter in their lawsuit in New York

State court.

TWELFTH DEFENSE:
It is contrary to public policy punish a Defendant for informing a party with whom he has an

agreement and a business relationship of his position when another party to that same agreement

expresses a diametrically opposite position.

THIRTEEN DEFENSE:
Defendant was had sufficient justification to inform a party with whom he has an agreement and

a business relationship of his position when another party to that same agreement expresses a

diametrically opposite position.

FOURTEENTH DEFENSE:
It was a legal and business necessity that Defendant timely inform parties with whom he has an

agreement and a business relationship of his position when another party to that same agreement

expresses a diametrically opposite position.

FIFTEENTH DEFENSE:
Plaintiffs have subsequently admitted in their New York State action that they have no damages as a result of the actions they allege Defendant committed.

SIXTEENTH DEFENSE:
Defendant has (or had, based upon Plaintiffs' allegation) a joint venture with the principal members of the Plaintiffs. In either case, the Plaintiffs are attempting to turn their dispute over joint venture interests into tortious interference claim.

SEVENTEENTH DEFENSE:
Plaintiffs did not have an ongoing business relationship with Cigna and Principal in connection with plaintiffs' efforts to obtain financing for the Project.

EIGHTEENTH DEFENSE:
Defendant did not interfere with Plaintiffs' relationship with Cigna, Principal, and other potential investors such that they would have entered into an economic relationship but for the Defendant's alleged wrongful conduct.

NINETEENTH DEFENSE:
Defendant did not send his letter for the sole purpose of harming Plaintiffs or used dishonest, unfair or improper means.

TWENTIETH DEFENSE:
Defendant reserves the right to assert any additional and further defenses as may be revealed by discovery, investigation or otherwise.

**WHEREFORE,** Defendant asks the Court to dismiss the complaint and enter judgment in favor of the Defendant.

## III
## COUNTERCLAIMS

Now comes the Richman and his Counterclaims against Plaintiff Street-Works Development, LLC and Third-Party Defendants Kenneth Narva, Richard Heapes and Jeffrey Levien.

1. Richman is a resident of the State of Florida with an address at 1320 Lenox Avenue, Miami Beach, Florida 33139.

2. Plaintiff, Street-Works Development, LLC ("Street-Works") is a New York limited liability company with its principal place of business located at 30 Glenn Street, White Plains, New York 10603. None of the members of Streets-Works is a citizen of the same state as defendant. Street-Works is comprised of the following members who are New York residents: Kenneth Narva, Richard Heapes, Gregg Sanzari, Tim Mount and Lucy Wildrick. Ken Park, a New Jersey resident is also a member of Street-Works. Anthony Colavolpe, a Connecticut resident is also a member of Street-Works. There are no other members of Street-Works.

3. The Third-Party Defendants are Kenneth Narva, Richard Heapes and Jeffrey Levien who are New York residents with their principal place of business located at 30 Glenn Street, White Plains, New York 10603

4. This action involves a partnership dispute between Richman, and co-venturers Richard Heapes, Kenneth Narva, and Jeffrey S. Levien, collectively the ("Partners") who, for reasons unknown to Richman, were not originally named as Plaintiffs in this litigation. (While the Partners and the Plaintiff (and their counsel) previously took the position that no joint venture existed (and that Richman was not a joint venture partner), the Plaintiffs now acknowledged in this action that a joint venture was formed with Richman in or around April of 2011, known as Street-Works/Richman ("SWR").

5. Street-Works Development, LLC acted as a nominee, fiduciary and agent for Street-Works/Richman but were never a member of SWR.

6. The purpose of the joint venture was to develop and reposition undervalued properties in the New York, Boston and Washington, D.C. metropolitan areas.

7.  During the discussions and negotiations leading up to the formation of the joint venture, the Partners repeatedly represented themselves as very experienced developers and also that they could utilize their experienced staff people within their other organizations to assist in us in the venture. Specifically they claimed they had been more than architects and planners in the projects that they had been involved with and had been the developers on and completed more than $1 Billion in mixed-use development. Richman knew that Partners had a planning and architectural role in projects and relied on their vigorous claims that they had also performed the role of "developer" in more than a $1 Billion of mixed-use development and their other representations as an inducement in making his decision to enter into the joint venture. Richman learned after the joint venture was formed that they had not performed the role of developer as they claimed on projects they claimed like Blue Back Square, New Roc City and Ridgeway Center. None of their employees from their other companies that they had assist them had the necessary experience with the role of the developer.

8. Partners and Richman agreed at the commencement of the venture on its structure and their respective roles. While the Richman led the site selection and entitlement process, the Partners agreed to lead the financing and all the development processes (other than entitlements) as well as managing the traditional planning services that was provided by one of their other companies. Based upon the Partner's representation of their experience as developers and their other capabilities, Richman began spending his time and his money traveling throughout the tri-state region's New York and Connecticut suburban counties locating properties for the joint venture. Richman reviewed thousands of sites and identified more than potential forty sites for SWR's development program. In addition, Richman traveled frequently to the New York region for meetings with property owners, brokers, consultants involved in the entitlement process,

potential equity and financial sources and for joint venture project meetings, all at his own expense.

9. The negotiations on the split of the cash from distributions, fees, etc. from the joint venture which commenced upon the formation of the joint venture in April 2011 were fully agreed to in November 2011.

10. In or around July 2011, the joint venture acquired an interest in real properties located by and largely negotiated by Richman through a nominal entity since no formal business entity had been formed by the joint venture partners. Plaintiff Street Works Development LLC, acting as the joint venture's fiduciary and nominee executed a purchase and sale agreement for the acquisition of the Property from its owner, Crestwood Station Plaza, LLC, which was dated as of July 1, 2011 (the "PSA"), for the properties situated at 300 and 308 Columbus Avenue, Tuckahoe, New York (the "Property"). Richman agreed to this arrangement of responsibility for the joint venture's property to be entrusted to Street-Works based upon the confidence, high trust and integrity that Jeffrey Levien, a member of the New York State Bar and a vice-president of Street-Works promised.

11. The Property was to be acquired for purposes of constructing a mixed-use development project on the site containing approximately forty-seven (47) residential units, as well as commercial retail space.

12. The Partners and Richman worked collectively from April 2011 through mid-September 2012 on the Project and other potential development sites. By the summer of 2012, the Project had been fully conceptualized and all the entitlements were in place and potential equity and debt sources had been identified.

13. Largely as  result of Richman's efforts, the joint venture obtained valuable land use entitlements for the Property, including, without limitation: a special use permit and variances from the Zoning Board of Appeals of the Village of Tuckahoe (approved on February 8, 2012), site plan approval from the Planning Board of the Village of Tuckahoe (approved on July 9, 2012) and on August 20, 2012 the Board of Trustees of the Village of Tuckahoe approved certain offsite public improvements relating to the Project.

14. In November 2011, the financial advisory firm of Cushman & Wakefield Sonnenblick-Goodman (the "Cushman Firm") was retained for SWR to obtain additional equity and debt financing needed for the acquisition and development of the Property and Project and the joint venture's potential development properties. The joint venture was looking for equity source(s) that would fund a development program in excess of $400 Million Dollars over the next three years. This is the same scale and timeframe of a development program that Richman had been successfully responsible for as CEO of Starwood Urban Investments LLC.

15. The Cushman Firm located more than a dozen firms in New York, Connecticut and Massachusetts that were interested in personal presentations from SWR. The personal presentations were jointly made by Richman and Jeffrey Levien. The presentation material assembled by the Partners listed the principals of SWR solely as Kenneth Narva, Richard Heapes, John Richman and Jeffrey Levien.

16. One of the firms Cushman located was Cigna Affiliates Realty Investment Group, LLC ("Cigna") who was interested as an equity investor provided there was business plan for the larger $400+ Million Dollar development program. Cushman received Cigna's final "non-binding" Letter of Intent ("LOI") dated June 26, 2012 to provide equity investments in not just the Project but also for the SWR's business plan for addititional development sites.

17. The named party in the LOI with Cigna is Street-Work Richman and the LOI specified that "John Richman, Ken Narva, Richard Heapes and Jeff Levien (the "Principals)" are the principals of Street-Works Richman. The LOI was "accepted and agreed" by Plaintiff on behalf of SWR as their transmittal to Cigna makes clear "We at SWR all look forward to moving ahead and working with Cigna on this exiting venture."

18. The parties to the LOI were never amended nor did Cigna ever approve a designee as potentially provided for in the LOI. While Plaintiffs have falsely asserted that the LOI provided for a closing without the Richman in the newly formed LLC by SWR and Cigna, the actual provision allows the four Principals (Narva, Heapes, Richman and Levien) to transfer certain of their membership interests without Cigna's approval only *after* the SWR and Cigna had formed the new LLC.

19. As Plaintiffs' Second Amended Complaint makes clear in their Paragraphs 29-31, 33-39 and 55-60 all of their business relationship with Cigna (and Principal) was based Cigna's (and Principal's) interest in SWR and its Project. There is no representation that Plaintiffs had any business relationship with either party except as SWR's representative under the LOI and Term Sheet and for SWR's Project and potential development sites.

20. Cushman also located Principal Global Investors ("Principal") who was interested as a lender for the Project. The personal presentation to Principal was jointly made by Richman and Jeffrey Levien. The presentation material assembled by the Partners listed the principals of SWR solely as Kenneth Narva, Richard Heapes, John Richman and Jeffrey Levien. Cushman, Wakefield, Sonneblick-Goldman obtained for SWR in August 2012 the "Principal Term Sheet" from Principal to provide $10,440,000.00 for what is commonly known as a senior construction loan for the SWR's Project. Principal Term Sheet did not name a specific borrower but required

that the Project be the one SWR's had under-development and their borrower be a "Single-purpose, bankruptcy-remote entity".

21. Richman and the Partners had agreed in February 2012 to expeditiously proceed with all the steps necessary to be able close and commence construction of the Project not later than September 2012. The date was critical both under the PSA and in order to be able to deliver the finished Project in the optimal rental season.

22. However, the Partners incompetent to non-existent performance as developers had caused significant delays and unexpected costs for the Project which damaged the relationship with Cigna and Principal and prevented meeting the conditions set forth in their LOI and Term Sheet. Since February 2012, the Project had not meaningfully moved forward on several areas the Partners were responsible for.

23. Richman and the Partners had agreed in February 2012 upon a list of architectural firms to interview and had collectively agreed that EDI International P.C. was the appropriate firm to hire. Nevertheless, the Partners unilaterally elected to hire themselves to produce the plans, specifications and construction documents by signing an agreement with their Street-Works Consulting LLC. Street-Works Consulting LLC hired a new employee (who they subsequently fired) to be the project manager. In late June 2012, the Partners announced to Richman that they were no longer going to have Street-Works Consulting LLC perform under their contract, they had signed with themselves. They announced that EDI International P.C. would after all be retained. EDI International P.C. reviewed the Street-Works Consulting LLC architectural work to date and indicated that almost none of it was usable in their opinion and their original fee and timetable remained as if no work had been done over the past several months. The Partners accepted this assessment of Street-Works Consulting LLC and signed EDI

International P.C. contract allowing them a full fee and timetable under the assumption that they were starting over. The Partners took no action to protect SWR's interest even though Street-Works Consulting LLC had not performed under their contract and wasted months of valuable time with the closing date looming.

24. The Partners assigned one their employees in another company to manage the EDI International P.C. contract and work production. Richman learned from EDI International P.C. in late August 2012, two month after the Partners had said that EDI International P.C. was working on the Project, that EDI International P.C. said it was to be on hold and had yet to receive instructions from the Partner's employee to commence the start of the working drawings and construction documents. The Partners claimed to be unaware of this and said they could not control their employee

25. In July 2011, shortly after entering into the PSA, SWR received documents from the seller indicated that the two gas service stations that had previously been on the parcels had had contaminated soils removed from the sites and that some elevated levels of contamination in the ground water wells had been detected. This mandated that extensive further testing would be required to satisfy equity partners and lenders on the remedial costs to develop the site for housing.

26. The Partners refused Richman's entreaties that testing be done in the Summer of 2011 and waited more than six months until the Spring of 2012 to commence. The employee from their other company that they put in charge of coordinating with the environmental consultants and defining the scope of the requested report did not understand what a developer needs to have for the lender. He was also unsupervised by the Partners or anyone. He instructed the consultants to prepare their report assuming only one scenario that was not supported or even suggested by

the testing data. He had them assume that all of the soils on-site would need to be removed down to a depth of more than ten feet and taken to an expensive regulated disposal facility. As a result, the venture was handed a draft report in August 2012, less than 30 days before closing, with an unanticipated remedial cost estimate of $1 Million Dollars. This delay in testing and the mismanagement, or rather non-management, of an unqualified employee of the Partners left the venture with no good options having spent a year in project approval, with closing scheduled only weeks away and all the negotiating strength now on the side of the seller. The Richman worked with the consultants in September 2012 to revise their draft report to assume only the conditions the data suggested and the cost estimate was reduced by two-thirds; however, the Partners failed to finalize the report.

27. The Partners had also agreed in February 2012 that they would locate qualified general contractors and select one to provide value-engineering advice during the design and construction document phase and hopefully also then provide an acceptable construction bid. That selection process did not begin for four months and the contractors presented for evaluation were all inappropriate. The contractor the Partner's selected produced hard cost estimates that were nearly 150% of all other indexes. These provided no beneficial guidance and the Partner's ended their relationship with them. However, at the critical time when the Project was supposed to be making construction design decisions, the Partner's through their delay and ineptitude failed to locate the advice needed. The relationship with the contractor that the Partner's had selected was ultimately terminated.

28. As of mid-September 2012, when the Partners stopped sharing any joint venture information, despite two mismanaged attempts, the construction document process had not made

any meaningful progress, no qualified contractors had been identified and the environmental report process had been badly mismanaged, delayed and was still incomplete.

29, Since the Partners had made virtually no progress, while wasting money and time, towards being able to commence construction in the seven months from February 2012 to September 2012, they had little leverage but to negotiate and sign a costly contract amendment to the PSA. The completed land entitlements "run with the land" and the obviously flawed draft environmental assessment provided no incentive for the seller to compromise. As a result of Partner's mismanagement and non-performance of the items needed for a closing on the scheduled date of September 17, 2012, and needing to five additional months to attempt to do the tasks they had failed to perform, in or around August of 2012 the Partners agreed to a modification of the PSA by a fifth Amendment for a closing date of February 15, 2013 which also provided for a large extension fee ($300,000.00) and other amounts to be paid by the purchaser. Those additional costs were all additions to the venture's budget and Cigna's LOI budget.

30. The Partners then revised their Project schedule to now have the four month construction documents process (re-)commence on September 7, 2012 and end in mid-December 2012. However, EDI International P.C. did not commence work on September 7, 2012 or any date and as of the date of their initial complaint, February 4, 2013 the Partners had not secured any work product that would shorten the four months needed for the construction documents production, nor be in a position to meet Cigna's requirements for closing as of February 15, 2013. The Partners then secured a 6th amendment to the PSA setting the outside date of closing for April 15, 2013 which they also missed and then they sued for specific performance.

31. Concurrent with the ripening of the Partner's "mismanagement" issues, Partners then engaged in a campaign divested Richman of his interest in the SWR joint venture's so that Plaintiffs could to retain all the benefits of the joint venture (including, without limitation, the PSA, the land use entitlements, potential financing arrangements and all the other potential development sites), without properly winding up SWR venture affairs in accordance with New York law.

32. Their first line of attack to achieve this from August 2012 up to the filing of their initial complaint in February 2013 was that Richman never became a member of the joint venture. Not until February 4, 2013 was it claimed that the joint venture was terminated, but instead, it was claimed that Richman was not, and never was, a partner (a position which was, and is, clearly disingenuous, and patently untrue). Indeed, on September 6, 2012 and again on September 15, 2012, Levien repeating his verbal statements made in August 2012, emailing Richman (and others), stating (in contravention to the position taken in this action) that Richman was "not a partner" in the joint venture for the Property. Neither of Levien emails, nor any writings or statements from any Partner or their counsel purports to terminate SWR, as claimed by Plaintiffs in their pleading.

33. *After* taking the position that Richman was not a partner in August and September 2012 which is *before* any claimed date of venture termination, the Partners then attempted in late-August 2012 and early-September 2012 to have Richman agree in writing not to be a partner but rather a consultant, while at the same time assume all of *their* roles for the Project and thereby waive all claims regarding their mismanagement. Richman rejected all such offers.

34. On September 12, 15 and 17, 2012, Richman requested that his Partners discuss with him one possibility, that the joint venture consider the option of "flipping" the Property (i.e.,

transferring SWR's rights under the PSA to a third party) in order to recoup any expenditures made and hopefully return a profit for the co-venturers. Unfortunately, the Partners never agreed to have any discussions on the topic.

35. The Partners then continued their campaign by excluding Richman from all meetings and information concerning the Project and SWR generally.

36. Richman emailed the Partners on September 17, 2012 asking them to retract the Levien's written position that Richman was not a partner but they never did.  Instead, reaffirming Levien's position, the Partners caused their counsel to transmit a letter to Richman two weeks later on October 3, 2012, wherein it was stated that Plaintiffs have "advice to you that as of September 1 2012 your services were no longer required" and that Richman was merely "a consultant for the Project at an at-will basis," and demanded that Richman cease and desist from, *inter alia,* holding himself out as "being involved" with the Project. Their counsel's letter does not include a single word or inference that SWR was claimed to have been terminated or any statement concerning their new position in this action that Richman had been a partner in SWR.

37. To protect his interests, correct the misstatements of counsel and Levien, and since the Partners had not agreed to retract Levien's position, and to ensure that all parties understood the nature of his (Richman's) involvement with the joint venture, Richman wrote back on October 5, 2012 to his Partners and the prospective other Project partners responding to counsel's October 3, 2012 letter, by refuting counsel's contentions, and by confirming his status as a joint venture partner for the development of the Project. In fact, Richman's October 5, 2013 letter states, in no uncertain terms, that "I welcome the consideration of an investment and participation by Cigna, Principal and G4 Capital or others. I believe it can be a very successful project and highly profitable. However, these financial transactions are made with the awareness

of my interest in the venture and subject to my rights of review and approval. I trust you will disclose my interest and other rights to all other parties considering joining the venture."

38. The *first* time Plaintiffs took the position that there was a joint venture "termination" was in their initial complaint, which was filed on February 4, 2013 while the parties were engaged in settlement discussions or almost five months after they claim.

39. The Partners and Plaintiff then continued their campaign to divest Richman of his interest by filing this action in bad faith, with claims that have no evidentiary support and they have made claims they later drop and two that were dismissed by this Court. In the First, First Amended and Second Amended Complaints, Plaintiffs have brought and then dropped claims for breach the joint venture agreement, breach of alleged fiduciary duty, tortious interference with contract, injunctive relief. Their counts for prima facie tort and breach of contract were dismissed by this Court. Only their claims for tortious interference with business relations and declaratory judgment (and the Court has ruled this latter claim is contingent upon success of the former claim) remain. Plaintiffs claimed in their pleading that "the closing dated for the PSA expired with plaintiff unable to purchase the Property" and that "plaintiffs were forced to abandon the Project" while at the same time they are pursuing a cause for specific performance to purchase the property for the Project arguing that the closing date is not yet called for under the PSA.

40. It is significant to note that even in Plaintiffs' claim for breach of contract with the fabricated "Service Agreement", the only alleged breach or non-performance by Richman relates to Richman's October 5, 2012 letter in response to the now retracted assertions that Richman was not a partner but an "at-will" consultant and not during the period before the Partners excluded Richman from the Project. The record is clear that the only dispute the Plaintiffs have with

Richman is based upon their now retracted position that Richman was not a partner but a consultant and their spurious claim that they terminated the joint venture on September 15, 2012.

41. As a result of the foregoing actions and inactions by the Partners and Street-Works Development LLC, the joint venture did not and does not have the plans and specification and construction documents, construction contracts, environment site assessment and an environmental remedial action plan for the Project.

42. As a result of the foregoing actions and inactions by the Partners and Street-Works Development LLC, the joint venture costs for the land purchase, consultant fees and site development costs for the Project would be significantly higher.

43. As a result of the foregoing actions and inactions by the Partners and Street-Works Development LLC, the joint venture could not meet the conditions for the Project by any potential equity or lenders requirements that are customary conditions precedent (or as set forth in the LOI or Term Sheet) for the funding of this Project that was in excess of $16 Million Dollars.

44. As a result of the foregoing actions and inactions by the Partners and Street-Works Development LLC and their campaign to deprive Richman of his interest in the joint venture, the opportunity to develop the Project and the $400+ Million Dollars worth of other potential properties was lost.

45 As a result of the foregoing actions and inactions by the Partners and Street-Works Development LLC, the Richman has suffered a complete loss of its investment and anticipated return from the joint venture reasonably expected to be in excess of $20 Million Dollars.

**Count One**
**Fraud and Misrepresentation**

46. By reason of the foregoing, the Partners committed fraud to induce Richman to enter into the joint venture by their misrepresentations of material facts that were essential to the joint venture and were inducements such as their claiming that they had had the role of developer in more than $1 Billion in mixed-use development and that they had employees within their companies that had competent development expertise to carry out the roles that they proposed to perform for the joint venture.

47. By reason of the foregoing, the Partners were not able to perform the roles for the joint venture they had agreed to.

48. By reason of the foregoing, Richman suffered damages reasonably expected to be in excess of $20,000,000 plus interest.

**Count Two**
**<u>Breach of Contract</u>**

49. By reason of the foregoing, the Partners did not perform the roles for the joint venture they had agreed to. These breaches led not only to increases costs but also to inability of the joint venture to be meet the conditions for the Project by any potential equity or lenders requirements that are customary conditions precedent to the funding of this Project that was in excess of $16 Million Dollars.

50. By reason of the foregoing, the Partners did not perform the roles for the joint venture they had agreed to and this resulted in the loss of the funding the opportunity to develop not only the Project but the $400+ Million Dollars worth of other potential properties that Cigna had conditionally agreed to fund.

51. By reason of the foregoing, the Partner's breach of contract which began well before their alleged date of termination of September 15, 2012, are actionable notwithstanding a subsequent termination of the joint venture, assuming that a termination has ever occurred.

52. By reason of the foregoing, Richman suffered damages reasonably expected to be in excess of $20,000,000 plus interest.

**Count Three**
**Breach of Fiduciary Duty**

53. By reason of the foregoing, Partners breached their fiduciary duties to Richman, as co-venturers, to act in his best interest with a duty of care and undivided loyalty in furtherance of the joint venture. Partners breached this duty by the assignment of SWR's PSA to an entity which Richman was not a member and without his consent. Partners breached this duty by failing to take action against Street-Works Consulting LLC, an entity which they held interests in, for its breach of its contract of services for SWR. Partners breached this duty by failing to take action against Street-Works Development LLC, an entity which they held interests in, for the breaches by its employees to perform by a reasonable professional standard. Partners breached this by excluding Richman from involvement in the Project so that he could provide consultation and advice. Partners breached this duty so they could claim as solely their own the corporate opportunities with Cigna.

54. By reason of the foregoing, the Partners breaches made it impossible to be meet the conditions for the Project by any potential equity or lenders requirements that are customary conditions precedent to the funding of this Project that was in excess of $16 Million Dollars.

55. By reason of the foregoing, the Partners breaches made it impossible to fulfill the opportunity to develop not only the Project but the $400+ Million Dollars worth of other potential properties that Cigna had conditionally agreed to fund.

56. By reason of the foregoing, Richman suffered damages reasonably expected to be in excess of $20,000,000 plus interest.

**Count Four**
**<u>Breach of Constructive Trust</u>**

**57.** By reason of the foregoing there existed between the Partners and the Richman a constructive trust based upon their fiduciary obligations and promises. Richman was promised to be part of joint venture, and the profits it will entail. Richman expended substantial time, costs and effort in furtherance of joint venture.

58. Partners breached this trust by their assignment of SWR's PSA to an entity which Richman was not a member and without his consent.

59. Partners breached this trust by their false assertion to Cigna and other that Richman was not a partner in SWR.

60. By reason of the foregoing, the Partners breaches made it impossible to be meet the conditions for the Project by any potential equity or lenders requirements that are customary conditions precedent to the funding of this Project that was in excess of $16 Million Dollars.

61. By reason of the foregoing, the Partners breaches made it impossible to fulfill the opportunity to develop not only the Project but the $400+ Million Dollars worth of other potential properties that Cigna had conditionally agreed to fund.

62. By reason of the foregoing, Richman suffered damages reasonably expected to be in excess of $20,000,000 plus interest.

**WHEREFORE**, Richman demands Judgment against Third Party Defendants, KENNETH NARVA, RICHARD HEAPES, JEFFREY S. LEVIEN and Plaintiff STREET-WORKS DEVELOPMENT LLC as follows:

1. On Count One, compensatory and punitive damages reasonably believed to be in excess of $20,000,000 plus interest.

2. On Count Two, compensatory damages reasonably believed to be in excess of $20,000,000 plus interest.

3 On Count Three, compensatory and punitive damages reasonably believed to be in excess of $20,000,000 plus interest.

4. On Count Four, compensatory and punitive damages reasonably believed to be in excess of $20,000,000 plus interest.

5. Reasonable attorneys' fees; and

6. Such other and further relief as the Court may deem just and proper.

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 6th day of February, 2014

Signature of Defendant _____

                                                  John H. Richman

Address                     1320 Lenox Ave.

                                                Miami Beach, Fl 33139

Telephone Number        (202) 256-4620